McHENRY, Appellant,

v.

CHILDREN'S HOME OF CINCINNATI et al., Appellees.

[Cite as *McHenry v. Children's Home of Cincinnati* (1989), 65 Ohio App.3d 515.]

Court of Appeals of Ohio,
Hamilton County.

No. C–890152.

Decided Dec. 6, 1989.

---

*Jerry R. Jung* ·and *Mariann Yevin,* for appellant.

*Taft, Stettinius & Hollister, Thomas Y. Allman* and *Christine M. Zimmer; Kohnen, Patton & Hunt* and *K. Roger Schoeni,* for appellee Children's Home of Cincinnati.

*Phyllis G. Bossin,* for appellees John and Jane Doe.

_____

*Per Curiam.*

This cause came on to be heard upon the appeal, the transcript of the docket, journal entries and original papers from the Probate Division of the Court of Common Pleas of Hamilton County, Ohio, the transcript of the proceedings, and the briefs and arguments of counsel. This court granted a joint motion to remove this case from the accelerated calendar, and we have, therefore, placed it on our regular docket.

Plaintiff-appellant, Heather Leigh McHenry, filed a complaint against defendants-appellees, the Children's Home of Cincinnati ("Children's Home") and John and Jane Doe, which sought: (1) a stay of the proceedings in the matter of the adoption of her son; (2) a declaration that the document permanently surrendering custody of her son was invalid; (3) a permanent injunction barring John and Jane Doe from adopting the child; and (4) the issuance of a writ of habeas corpus ordering the return of the child to her custody. The defendants filed separate motions for summary judgment, which the trial court granted. The plaintiff appealed to this court.

On appeal, the plaintiff contends that the trial court improperly granted the defendants' motions for summary judgment. We find no error.

In November 1987, the plaintiff, a twenty-two-year-old student attending the University of Cincinnati, discovered that she was pregnant. After discussing the situation with the putative father, Timothy Rouse, and her parents, the plaintiff contacted Children's Home.

On December 30, 1987, the plaintiff, her parents, and Rouse met with Mary Lou Albers, an employee of the Children's Home. At that time, the plaintiff indicated that she wanted to place the baby for adoption. The plaintiff met with Albers on January 5 and January 12, 1988. She continued to express her desire to give the baby to Children's Home for the purpose of adoption. She stated that she believed that adoption would be in the best interest of the child. The plaintiff further stated that her parents would support any decision she made regarding the child.

On January 13, 1988, the plaintiff gave birth to a baby boy. Immediately after the birth, the plaintiff signed a document giving Children's Home temporary custody of the baby. The baby was then placed in a foster home.

After seeing the baby, the plaintiff and Rouse discussed the possibility of marriage. They ultimately decided against marriage at that point in their lives. Then the plaintiff began to consider the possibility of raising her child as a single parent.

The plaintiff discussed this option with her parents and Rouse. Her parents stated that she could bring the baby back to their home in Chillicothe, and raise her child there. However, they noted the problems that would develop in trying to raise an illegitimate baby as a single parent in a small town. They also noted the stress that would be placed on them. Finally, they stated that they would support their daughter in any decision she made.

Rouse stated that he would help the plaintiff raise the baby in any way he could. However, he expressed his opinion that the best thing for the baby and for them would be adoption.

The plaintiff then discussed with Albers the possibility of raising the child herself. The plaintiff voiced the areas of concern noted by her parents. Albers suggested that the plaintiff consider raising the child outside her parents' home with financial aid from welfare. The plaintiff rejected that option.

Eventually, the plaintiff informed Albers that she wanted the baby to be adopted. Rouse signed a permanent surrender of custody to the Children's Home on February 12, 1988. Five days later, the plaintiff signed a similar

document because she believed that adoption was the best alternative for her child.

On February 18, 1988, the plaintiff telephoned Albers and expressed her concerns over signing the document which permanently surrendered her custody of the child. The plaintiff stated that she was unsure of whether she wanted her baby to be adopted. However, she did not want the baby returned to her. The Children's Home agreed to stay the adoption proceedings to give the plaintiff time to reconsider her decision.

The plaintiff then went to see Dr. Charles Handel, a clinical psychologist recommended by Albers. She and Handel discussed her concerns with raising her child at her parents' home and with giving the child to another family through adoption proceedings.

On March 9, 1988, the plaintiff called Albers and stated that she wanted her baby placed for adoption as soon as possible. She explained that she would have liked to keep her baby, but that she believed the best alternative for the baby and herself was adoption. Approximately two weeks later, the baby was placed with John and Jane Doe.

On April 4, 1988, the plaintiff called Albers and stated that she had decided she wanted custody of her child. Albers informed her that the child had been placed with a family that wanted to adopt him, and that the plaintiff could not have him back. The plaintiff then expressed dissatisfaction with Children's Home and their handling of her case, and she filed the instant action.

■ An agreement by a child's parents or legal guardian to surrender a child to the permanent custody of a certified association or institution as described in R.C. 5103.15 constitutes a contract when accepted by such association or institution and when voluntarily made without fraud or misrepresentation. *In re Miller* (1980), 61 Ohio St.2d 184, 15 O.O.3d 211, 399 N.E.2d 1262. Such a contract cannot be revoked by the parents or legal guardian absent the consent of the association or institution. *Id.*

■ The plaintiff contends that her family, Rouse and Children's Home exerted undue influence in pressuring her to sign the document which permanently surrendered her custody of her child. She, therefore, argues that her consent to surrender custody was not voluntarily given.

In reviewing an issue of duress in a case where a parent surrenders custody of a child, "the courts now seek to determine whether the threats were such as to have overcome the will of the person threatened and to have created a state of mind such that he was induced to do an act which he would not otherwise have done and which he was not bound to do." *In re Hua* (1980), 62 Ohio St.2d 227, 1 O.O.3d 270, 405 N.E.2d 255, citing *Tallmadge v.*

*Robinson* (1952), 158 Ohio St. 333, 49 O.O. 206, 109 N.E.2d 496. Ultimately, the issue to be determined in this case is whether the plaintiff "really had a choice" when she relinquished her custodial rights, and had the freedom of exercising her own will. See *Hua, supra.*

■ Albers provided counselling services for the plaintiff regarding the placement of her baby. She presented the options available for the custody and care of the baby, and she discussed the positive and negative aspects of each option. Albers also addressed the plaintiff's concerns with raising the child as a single parent and with placing the baby with adoptive parents. The plaintiff testified that Albers did not encourage or discourage her from keeping her child or from surrendering custody of the child. She further stated that Albers did not make the decision of where to place the baby for her. We fail to see how Albers, on behalf of Children's Home, induced the plaintiff to surrender custody of her child against her free will.

Although the issue of duress placed on the plaintiff by her family and Rouse is not raised in the complaint, we address it briefly. The plaintiff's family expressed their concerns to the plaintiff regarding the difficulties in raising an illegitimate child in a small town as a single parent. However, they opened their home to their daughter and her child, and they offered their support in any decision made by the plaintiff. Rouse expressed his opinion that adoption provided the best alternative for the baby, but he also offered his support in the plaintiff's decision. The plaintiff testified that neither her parents nor Rouse pressured her into placing the baby for adoption. Although Rouse and the plaintiff's parents voiced concerns and offered opinions, there is no evidence that they unduly influenced the plaintiff into making a decision other than her own.

The record indicates that the plaintiff was very confused and that she had a difficult time making a decision about custody of her child. She stated that she tried to reach a decision quickly so that the child could be placed in a permanent home as early as possible, but she had difficulty deciding what would be best for everyone involved. Albers, Rouse and the plaintiff's family tried to help the plaintiff through this difficult period, but they did not force her to relinquish custody of her baby. There is nothing in the record to show that the plaintiff was pressured into signing the document permanently surrendering her custody of the child or that she did not have the freedom to exercise her will.

The plaintiff voluntarily signed the document which permanently surrendered her custody without fraud or misrepresentation. The document is, therefore, valid.

■ The plaintiff next argues that she revoked her consent to surrender custody, and that Children's Home accepted the revocation. She, therefore, concludes that the document is void, and that she is entitled to regain custody of her son.

As stated previously, an agreement to permanently surrender custody of a child cannot be revoked without the consent of the association or institution to which custody of the child was given. See *In re Miller, supra.* The Supreme Court of Ohio has reasoned this rule as follows:

"Section 3107.06, Revised Code, recognizes the right of withdrawal of consent, whereas Section 5103.15, Revised Code does not. Where a permanent surrender has been made in compliance with the latter section, the institution to which the surrender is made is permanently *in loco parentis* so far as the minor children and their parents are concerned. It is the institution thereafter which may appear in any proceeding for adoption and which may give its consent or withdraw the same before the order of adoption is made, and the parents, having permanently surrendered their children to the institution, are no longer even necessary parties to any adoption proceeding." *Kozak v. Children's Lutheran Aid Society* (1955), 164 Ohio St. 335, 342, 58 O.O. 125, 129, 130 N.E.2d 796, 801–802. The Supreme Court concluded that a temporary surrender of custody may be revoked, "but a permanent surrender is exactly what its name signifies—one made forever." *Id.* at 342, 58 O.O. at 129, 130 N.E.2d at 802.

One day after signing the document entitled "permanent surrender of custody," the plaintiff telephoned Albers and stated that she had some concerns about giving away her child. When asked if she wanted the baby, the plaintiff said no because she was unsure whether she wanted to keep the baby or whether she wanted the baby to be adopted. Three weeks later, after meeting with Dr. Handel several times, the plaintiff told Albers that she wanted the baby to be placed with an adoptive family as soon as possible.

Whether the plaintiff's actions constitute an attempted revocation of her permanent surrender of custody need not be resolved since it is clear that the Children's Home did not accept her uncertainty as a revocation. When the plaintiff expressed her problems with her permanent surrender of custody, Albers agreed to "hold off" the adoption proceedings. Albers and Jeane Goings, co-director of the social services department of the Children's Home, testified that certain procedures are followed when a parent wishes to revoke a permanent surrender of custody. First, the parent must present an adequate plan establishing how the child would be cared for if custody were restored to the parent. Then the document permanently surrendering custody would be voided and initialed by the parent and by an employee at the

Children's Home. Finally, the parent would have to sign a form releasing the Children's Home from liability for the child. None of these procedures was followed in this case.

In this case, where certain procedures existed to revoke a permanent surrender of custody and where those procedures were not followed, temporarily staying adoption procedures is not evidence of acceptance of the plaintiff's alleged revocation. The document permanently surrendering the plaintiff's custody of her child is, therefore, not void.

■ Summary judgment may be granted where no genuine issue of material fact remains to be litigated, where the moving party is entitled to judgment as a matter of law, and where it appears from the evidence, when viewed most strongly in favor of the party against whom the motion is made, that reasonable minds can come to but one conclusion, that being adverse to the party opposing the motion. Civ.R. 56(C); *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 4 O.O.3d 466, 364 N.E.2d 267. In the instant case, no evidence was presented to establish that the plaintiff's surrender of custody was not voluntary, or that the Children's Home accepted her alleged revocation of the permanent surrender of custody. Summary judgment was, therefore, properly granted on behalf of the Children's Home and John and Jane Doe.

We affirm the judgment of the trial court.

*Judgment affirmed.*

DOAN, P.J., KLUSMEIER and UTZ, JJ., concur.